# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| BENJAMIN KARL SMITH, | CV 13-107-BLG-SEH-CSO |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| CITY OF BILLINGS, BILLINGS POLICE DEPARTMENT, CHIEF ST. JOHN and OFFICER MORRISON, | |
| Defendants. | |

Benjamin Smith filed this civil rights action, pursuant to 42 U.S.C. § 1983, based on his arrest by Officer Morrison on December 23, 2012. Defendants' Motion for Summary Judgment is pending. This matter is assigned to Judge Haddon and has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). *ECF 16*.

Having reviewed the record, the Court recommends Defendants City of Billings, Billings Police Department, and Chief St. John's Motion for Summary Judgment be granted, Defendants' motion on Smith's claims brought under MCA § 44-2-117 be granted, and Defendant Morrison's Motion for Summary Judgment be denied.

# I.    Background[1]

On December 23, 2012, Billings Police Officer Grant Morrison was patrolling the 400 block of South 34th Street in Billings, Montana, as part of his routine patrol of the area. *Defendants' Statement of Undisputed Facts (ECF 35) at ¶ 1.* At approximately 9:45 p.m., Morrison observed a blue 2002 Acura sedan with its lights off, "parked on the shoulder of the road." *Id at ¶2.* It did not appear to Morrison that the engine of the vehicle was running.

In the video from Morrison's patrol car, the subject vehicle appears to be legally parked on the residential street. *Video (ECF 37).* Morrison's affidavit states that the vehicle caught his attention for several reasons. *ECF 35-1 at 2.* First, it was a cold, wintry night. He observed two people sitting in the car, and the car was not running. The two people were "moving their heads up and down...." *Id.* Morrison made a mental note of the vehicle and continued his patrol.

---

[1]Consistent with summary judgment standards discussed below, the following facts are taken from the materials of record, including videotapes taken from Officer Morrison's patrol car (*ECF 37*). *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that courts may look to video evidence to determine whether a genuine dispute of material fact exists or if one party's version of events cannot reasonably be trusted).

At approximately 10:17 p.m., Morrison again passed the area and saw what he believed to be the same car parked in the same spot and still not running, with the two occupants still in the vehicle. Morrison decided to check on the welfare of the people in the car because it was below freezing, dark, and the vehicle had been stationary for over thirty minutes. *Id. at 3.* Morrison states that he circled the block, pulled in behind the vehicle,[1] and activated his spotlight so he could see the vehicle better. He did not activate sirens or any other emergency signal equipment. *Id.*

Before Morrison got out of his patrol car, the occupant on the driver's side of the vehicle, later identified as Smith, exited from the vehicle. *Id. at ¶ 8.* Morrison states that, because it was dark outside and there were no internal lights in Smith's car, this was the first time that Morrison realized Smith was African American. *Id. at ¶ 9.* Morrison had no prior dealings with Smith and did not recognize him. *Id. at ¶ 10.*

---

[1]The video produced by Defendants shows Morrison making what appears to be a U-turn, driving two blocks in one direction, making a right hand turn, and traveling one additional block before encountering Smith's vehicle.

The videotape taken from Morrison's patrol car shows that the following events occurred, at the following running times:

| | |
|---|---|
| 00:46 | Morrison parks at back of Smith's vehicle and turns on spotlight |
| 00:56 | Smith opens driver's side car door and turns as if to step out of the vehicle |
| 1:00 | Morrison says, "Noticed you've been there for awhile–everything ok?" (Morrison cannot be seen on the video) |
| 1:00-1:10 | Smith gets out of the car and stands directly in front of Morrison's vehicle and has what appears to be a flashlight in one hand and a phone in the other. He gives some explanation but cannot be heard on video–Morrison says ok at 1:07. |
| 1:12 | Morrison asks: "Who's your friend?" |
| 1:13 | Smith responds, "Jacie." |
| 1:19 | Morrison asks: "Do you have any ID on ya?" |
| 1:20 | Smith seems to respond that he does not but it is inaudible |
| 1:23 | Morrison asks, "How long have you been here now?" |
| 1:25-1:37 | Smith gives long explanation which cannot be heard on video |
| 1:37 | Morrison says, "I don't know who you are I've never met you before." Smith makes some additional comments which cannot be heard on video |
| 1:53 | Morrison says, "Stay right there." |
| 1:54 - 2:14 | Morrison talks to dispatch |
| 2:18 | Morrison shuts his car door and says, "The reason I'm out here I saw you guys pull up for awhile ago and you have just been sitting in your car the whole time." Morrison then begins to shine his flashlight into Smith's car. |

| | |
|---|---|
| 2:24 | Smith says, "No no no, I just really pulled up here right now–that was another car, a green one that looks like this one, but it was green . . . I just got here like 5 minutes ago." |
| 2:40 | Morrison asks: "Someone shining a laser pointer around here . . ." |
| 2:44 | Smith responds that he has one on the tip of his keys |
| 2:49 | Morrison says–"So you don't have your ID on ya" |
| 2:50 | Smith says no, he hasn't gotten his birth certificate back from California to get his Montana drivers license. Morrison approaches Smith as he is talking and pulls out his notebook |
| 2:56 | Morrison asks Smith for his name and date of birth. Smith gives his correct name. The shadow of what appears to be another officer can be seen next to Morrison |
| 3:07 | Morrison asks, "Do you have anything sharp or illegal on you right now." |
| 3:11 | Smith says, "Not that I know of." |
| 3:10 | Morrison says, "OK, I'm just going to pat you down for my safety, come on over here, face away from me, put your hands behind your back I'm just going grab your hands while I pat you down ok." Smith complies. |
| 3:17 | Morrison appears to speak to another officer telling the officer to identify the passenger in Smith's vehicle. |

*Video of December 23, 2012 Incident (ECF 37).*

At 3:44 minutes into the video, Morrison cuffs Smith and

arrests him for having a knife as a concealed weapon, after Smith

informs Morrison of the knife on his side. After arresting Smith, Morrison, along with Officer Raschkow, checked on the passenger in the car. *ECF 35 at ¶ 18.* As Morrison looked inside the driver's side of Smith's car to talk to the passenger, he saw a plastic bag with a white crystalline substance in plain view on the driver's side of the center console. From his experience, it appeared that the bag contained methamphetamine. Morrison secured the bag into evidence. *Id. at ¶ 19.*

Smith was charged in state court, Case No. DC 13-022, with criminal possession of a dangerous drug and carrying a concealed weapon. *Defendants' Status Report to the Court re: pending criminal charges (ECF 11).* Smith filed a motion to suppress in state court raising the same constitutional concerns at issue in the present litigation. *Id.* Smith was charged separately in a second case (DC 13-089) relating to a December 18, 2012, stabbing and robbery. On June 27, 2013, Smith signed a plea agreement in the second case (DC 13-089) and entered a no contest guilty plea to the robbery charge. As part of that plea agreement, all other

counts, including the charges arising from the incidents at issue in this case, were dismissed. *June 27, 2013 Plea Agreement (ECF 11-1).* Smith was sentenced on the robbery conviction on August 29, 2013. *Defendants' September 10, 2013 Status Report (ECF 15).*

Morrison states that he made no comments to Smith concerning his race. *ECF 35 at ¶ 23.* No racial profiling complaint was made to the Billings Police Department by Smith against Morrison or in connection with the December 23, 2012 incident. *Id. at ¶ 25.* The City of Billings Police Department maintains specific policies and procedures related to racial profiling. Morrison was trained regarding these policies and procedures prior to December 23, 2012. *Id. at ¶ 26.* Morrison has never been the subject of any disciplinary proceedings, investigations, or complaint-processes involving racial profiling. *Id. at ¶ 27.*

## II.    <u>Allegations in the Complaint</u>

Smith filed his Complaint in state court on June 18, 2013, and Defendants removed it to this Court on August 6, 2013.  In

the Complaint, Smith alleges that Morrison violated his Fourth Amendment rights under the United States Constitution, and that Morrison violated Article II, Sections 10 and 11, of the Montana State Constitution by illegally arresting him. Smith also alleges that Morrison violated MCA § 44-2-117 because there was no justifiable reason for the police to make contact with him. Smith also contends that "Defendant" (presumably Morrison) violated procedure by making a false police report.

## III.   Parties' Arguments

Defendants argue they are entitled to summary judgment on Smith's claims because: (1) Smith has made no allegations against the City of Billings, the City of Billings Police Department, or Chief St. John; (2) there is not a private right of action under MCA § 44-2-117; and (3) Smith cannot establish a constitutional violation against Morrison as a matter of law. *Defendants' Brief (ECF 34) at 9.*

Morrison contends his actions were lawful under the community caretaker doctrine, his actions did not constitute a

seizure, and Smith's arrest was lawful.  Morrison also contends he
is entitled to qualified immunity.  *ECF 34 at 23-25.*

Smith argues that the initial stop was unconstitutional
because Morrison did not have a particularized suspicion to
believe Smith had committed, was committing, or was about to
commit a criminal offense.  Smith argues that the initial contact
with Smith and his passenger cannot be justified upon the
community caretaker doctrine.  Smith contends Morrison violated
MCA § 46-5-401 and that the stop and search cannot be justified
by the suggestion of exigent circumstances.  *Smith's Response
(ECF 39).*

## IV.  **Summary Judgment Standard**

Fed. R. Civ. P. 56(a) requires the court to grant summary
judgment if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a
matter of law.  The movant bears the initial responsibility of
informing the district court of the basis for its motion, and
identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. A moving party without the ultimate burden of persuasion at trial has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine

need for trial. *Matsushita*, at 587 (quotation omitted).  In resolving a summary judgment motion, the Court must view the facts in the light most favorable to the nonmoving party.  *See Plumhoff v. Rickard*, 134 S.Ct. 2012, 2017 (2014).  The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.  *Tolan v. Cotton,* 134 S. Ct. 1861, 1863 (2014) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

## V.  Analysis

### A.  City of Billings, Billings Police Department, and Chief St. John

Smith's Complaint states no allegations against the City of Billings, the Billings Police Department, or Chief St. John.  Nor does Smith state any contentions against these Defendants in his response to Defendants' Motion for Summary Judgment.  Accordingly, the Motion for Summary Judgment should be granted as to these Defendants.

### B.  Morrison–Alleged Constitutional Violation

The only remaining claims are brought against Morrison.  In

his Motion for Summary Judgment, Morrison urges the Court to

hold, as a matter of law, that he did not commit a constitutional

violation.

As noted above, Morrison contends that his initial encounter

with Smith was lawful under the community caretaker doctrine.

As an initial matter, the Court need not evaluate whether this

doctrine applies to the initial approach of Smith.  Law

enforcement officers do not violate the Fourth Amendment's

prohibition of unreasonable seizures by approaching individuals in

public places and asking questions.  *United States v. Drayton*, 536

U.S. 194, 200 (2002) (holding that law enforcement officers "do not

violate the Fourth Amendment's prohibition of unreasonable

seizures merely by approaching individuals on the street or in

other public places and putting questions to them if they are

willing to listen").  But a consensual encounter becomes a seizure

when "in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that he was not

free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Florida v. Bostick*, 501 U.S. 429, 434–35 (1991) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their request is required." (citations omitted)).

An officer's approach of a car parked in a public place does not constitute an investigatory stop or a seizure under the Fourth Amendment. *U.S. v. Kim*, 25 F.3d 1426, 1430 n.1 (9th Cir. 1994). In approaching the scene, Morrison parked behind Smith but was not blocking Smith's vehicle. Morrison did not activate his sirens or lights, and he did not order Smith out of the vehicle. There is no genuine issue of material fact whether Morrison's initial approach of Smith was violative of Smith's constitutional rights. It was not. *See United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007). The issue here is whether the facts establish, as a

matter of law, that the initial encounter lawfully escalated into a seizure.

The Ninth Circuit has identified the following factors to consider in determining when a person was seized, any one of which, if present, could constitute a seizure: "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter." *Washington*, 490 F.3d at 771-72 (*citing Orhorhaghe v. INS*, 38 F.3d 488, 494-96 (9th Cir. 1994)).

Applying these factors, and construing the facts in the light most favorable to Smith, the Court finds that there is a genuine issue of material fact whether Morrison's encounter with Smith lawfully escalated into a seizure. First, although the encounter occurred on a public street, it was a residential neighborhood, around 10:15 p.m., and the lighting caused Morrison to use his

spotlight and flashlight.  Smith states that his vehicle was parked in front of the home of his passenger, who had just gotten into the car.  *ECF 39 at 4.*  Second, there were two officers on the scene. The court in *Orhorhaghe*, 38 F.3d at 494-495, n.7 (*citing with approval United States v. Bloom*, 975 F.2d 1447, 1454 (10th Cir. 1992)), held that the questioning of one suspect by two DEA agents increased the encounter's coerciveness and tilted in favor of finding a seizure.  Third, Morrison did not inform Smith of his right to terminate the encounter.  Rather, within one minute of approaching Smith's vehicle and before any illegal activity was discovered, Morrison instructed Smith to "stay right there." Morrison's command for Smith to stay where he was constituted a "show of authority" implying that compliance was compelled. Fifth, Morrison did not ask Smith for his consent to talk to him or search his person but instead informed Smith that he was going to pat him down.  Sixth, when Morrison indicated he was going to search Smith, Smith put his hands up in the air *(Video (ECF 37) at 3:12)* suggesting that at that point that he did not feel free to

leave.

Even if this were not enough to create an issue of fact regarding the encounter, it is clear that within another minute (two minutes after Morrison approached Smith and approximately three minutes into the stop), Morrison began the pat down search of Smith, told Smith to put his hands behind his back, and grabbed Smith's hands while he patted him down. Thus, at this point, Morrison had seized Smith and subjected him to a search escalating the encounter into an investigatory stop. Just two minutes into the encounter, Morrison needed both reasonable suspicion that Smith was engaged in criminal activity sufficient to justify the seizure and reasonable suspicion that Smith was carrying a weapon to justify the pat-down search. There is a genuine issue of material fact regarding whether he had either.

To justify a brief, investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer must point to specific, articulable facts that gave rise to a "reasonable suspicion" that the suspect was engaged in criminal activity. *Id.* at 21. "An investigatory stop

must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Courts must consider the "totality of the circumstances" to determine whether the police officer had "a particularized and objective basis for suspecting legal wrongdoing." *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) ("[S]pecific, articulable facts . . . together with objective and reasonable inferences, [must] form the basis for suspecting that the particular person detained is engaged in criminal activity." (internal quotation marks omitted)).

Morrison argues that "the innocuous nature of the police-citizen interaction between Morrison and Smith quickly morphed into a criminally suspicious situation." *MSJ Brief (ECF 34) at 19.* He submits that his suspicions were reasonable based upon the following facts: (1) Smith's car was parked in the same spot for over 30 minutes, was not running, and it was cold outside; (2)

Smith immediately got out of the car when Morrison stopped to ask if everything was ok; (3) Smith denied being parked there for that long; and (4) Smith's unusual behavior coupled with his evasive responses made Morrison concerned a drug crime was occurring. *MSJ Brief (ECF 34) at 20-21*.

Many of these allegations are disputed. And, even if they were undisputed, being parked in a car in front of a residence for 30 minutes even on a cold night does not alone give particularized suspicion of criminal drug activity. Neither does opening one's car door after a spot light is shined on the car by a police officer. The cases cited by Morrison in support of his arguments are distinguishable – in each case there was suspicion of criminal activity sufficient to initially stop the suspect. Here there was no articulable suspicion to stop Smith. Rather, the stop was allegedly based upon Morrison's concern for Smith and his passenger's safety. In *U.S. v. Thomas*, 863 F.2d 622 (9th Cir. 1988), the Ninth Circuit found nothing inherently suspicious in the fact that Thomas got out of his car without being asked to do so. *Id* at 628;

*see also United States v. Kerr*, 817 F.2d 1384 (9th Cir. 1987)(suspect exited car primarily in response to officer's official appearance and conduct, rather than of his own volition). Smith did open his car door when Morrison directed his spot light at the vehicle but got out of his vehicle after Morrison directed a question at him ("I noticed you've been here for awhile is everything ok?"). *Video (ECF 37) at 1:00.* Additionally, Smith moved slowly as he got out of the vehicle and stood in one location at the front of Morrison's vehicle in a compliant and non-threatening manner. These actions do not give rise to particularized suspicion of criminal activity.

Morrison also relies upon Smith's alleged "evasive responses." Morrison asked Smith if he was ok, who his passenger was, and his name. While there is no evidence in the record regarding the specific response of Smith, he did respond and properly identified himself. After he had asked his initial questions, Morrison had no reason to continue the caretaking functions and yet he told Smith to "stay right there" within

approximately 30 seconds of the stop. Two minutes into the encounter he began a pat-down search of Smith. All these factors, even considered together, do not suggest that Smith was engaged in criminal activity or was about to be engaged in criminal activity. *Cortez*, 449 U.S. at 417–18.

Even if Morrison had a reasonable suspicion that Smith was engaged in criminal activity, a further justified belief that Smith might be armed and dangerous would be required to justify the search of his person. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he may conduct a limited protective search for concealed weapons. *Terry*, 392 U.S. at 24. Morrison attempts to justify the search of Smith by arguing that drug crimes were common in the area, drug crimes often involve weapons, and Smith was wearing heavy winter clothing conducive to concealing a weapon.[2] That

---

[2]Morrison also submits that Smith's initial denial of having a weapon and then recanting that statement also justified the search but Morrison had already seized Smith and had Smith's hands held behind his back when Smith made those statements. *ECF 37–Video at 3:10-*

drug crimes may have been common in the area does not necessarily give rise to the belief that Smith would be armed. If that were the case, every person in a high drug crime area would be subject to search. Furthermore, it does not appear from the video that Smith was wearing heavy winter clothing. He does not appear to even have a coat on but rather what looks to be a heavy over-shirt. Even if he had been wearing heavy winter clothing, it was cold outside. It is reasonable to assume that most individuals wear heavy winter clothing while outside on a late December night in Billings, Montana.

Thus, it has not been demonstrated that Morrison had a particularized suspicion to believe that Smith was engaged in criminal activity or that he might be armed and dangerous. As noted, in the section of the video leading up to the pat down, Smith appears to be acting in a non-threatening and compliant manner. Even if Morrison was checking on the safety Smith and his passenger, he turned that welfare check into an investigatory

_____

*3:20.* As such, those statements cannot be a justification for the search.

search and seizure within two and a half minutes.

The Court concludes that summary judgment on the constitutional claim against Morrison should be denied.

## C. <u>Morrison – Qualified Immunity Defense</u>

Having concluded that Morrison is not entitled to summary judgment on the constitutional violation alleged, the Court must consider whether he is entitled to qualified immunity. "Qualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

In resolving the question of qualified immunity at the summary judgment stage, the Supreme Court has instructed that courts must engage in a two-pronged inquiry. As applied here, the first prong asks whether the facts, taken in the light most favorable to Smith, show that the officer's conduct violated the Fourth Amendment's prohibition against unreasonable seizures. For the second prong of the qualified-immunity analysis, the

Court must ask whether the right in question was "clearly established" at the time of the violation. *See Tolan v. Cotton*, 134 S. Ct. at 1865-66. In *Tolan*, the Court emphasized that its qualified-immunity cases illustrate "the importance of drawing inferences in favor of the nonmovant...." *Id.* at 1866.

Turning to the first prong, the Court concludes, based on the analysis set forth above, and taking the evidence in the light most favorable to Smith, that Smith has established the violation of a constitutional right.

Turning then to the second prong, the Court must consider whether this right was clearly established. There need not be a case with this precise factual scenario at issue. *See Torres v. City of Madera*, 648 F.3d 1119, 1129 (9th Cir. 2011) ("[W]e have repeatedly stressed that officials can still have 'fair warning' that their conduct violates established law 'even in novel factual circumstances [.]' ") (*citing Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). *Brosseau* made clear that the "clearly established" inquiry must be undertaken not as a broad general proposition,

but in light of the specific context of the case. *Brosseau,* 543 U.S. at 198. The plaintiff bears the burden of demonstrating that the right was clearly established. *See Collins v. Jordan*, 110 F.3d 1363, 1369 (9th Cir. 1997).

The Court concludes that the law with respect to this seizure was clearly established. Courts are unequivocal—and have been for decades—that there must be "a particularized and objective basis for suspecting legal wrongdoing." *See Arvizu*, 534 U.S. at 273 (internal quotation marks omitted); *Cortez*, 449 U.S. at 417–18 ("Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."); *Terry*, 392 U.S. at 22.

As set forth above, at the time of Smith's seizure, the reasons to suspect him of being engaged in criminal activity or being armed were tenuous. While reasonable-suspicion inquiries are generally fact-specific, the cases in which courts have concluded that reasonable suspicion exists have always required

something more specific and articulable than is evident here. *See, e.g., U.S. v. I.E.V.*, 705 F.3d 430, 435 (9th Cir. 2012) (holding that an officer was not justified in frisking the defendant). In *I.E.V.*, the Ninth Circuit noted: "The Supreme Court has not allowed a general suspicion of drug activity to provide blanket authorization for frisking anyone in the vicinity." *Id.* (*citing Ybarra v. Illinois*, 444 U.S. 85 (1979) (officers lacked reasonable suspicion to detain and search a defendant solely because of his presence in a tavern in which the officers suspected the bartender dealt heroin).

Here, Morrison states that he did not stop his patrol car because he suspected that Smith was engaged in criminal activity. Morrison defined the stop as a caretaking stop. But it appears that Morrison did not end the encounter after Smith said that everything was OK. Smith was compliant and non-threatening, no specific criminal activity had been identified, and there was no overtly suspicious behavior on the part of Smith. Giving evasive answers to a police officer by itself is insufficient to establish reasonable suspicion. The facts do not establish that qualified

immunity is appropriate under these facts. *See Torres*, 648 F.3d at 1129 (test of whether right is clearly established cannot be so narrow that qualified immunity is transformed into absolute immunity).

### D.  <u>Morrison – Alleged Violation of MCA § 44-2-117</u>

Smith also contends in his Complaint that Morrison violated MCA § 44-2-117 which prohibits peace officers from engaging in racial profiling (MCA § 44-2-117(1)) and provides that race may not be the sole factor in "constituting a particularized suspicion that an offense has been or is being committed in order to justify the detention of an individual."  MCA § 44-2-117(2)(b).

Defendants argue that MCA § 44-2-117 does not provide a private right of action.  *ECF 34 at 26-29.*  Smith does not address this argument in his response brief.  Further, he provides no additional basis for such a claim.  The statute does not expressly provide for a private right of action and the Montana Supreme Court has not found such a right.  *See generally Doyle v. Clark,* 254 P.3d 570, 576-77 (Mont. 2011).

The Motion for Summary Judgment should be granted on this claim.

## VI. <u>Conclusion</u>

Based on the foregoing, IT IS RECOMMENDED that Defendants City of Billings, Billings Police Department, and Chief St. John's Motion for Summary Judgment be GRANTED. Defendants' Motion on Smith's claims brought pursuant to MCA § 44-2-117 should be GRANTED. Defendant Morrison's Motion for Summary Judgment should be DENIED.

**NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT**

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[3]  28 U.S.C. § 636.  Failure to timely file written objections may bar a *de novo* determination by the district judge and/or

---

[3]As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d). Therefore, three (3) days are added after the period would otherwise expire.

waive the right to appeal.

These Findings and Recommendations are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 5th day of September, 2014.

  /s/ Carolyn S. Ostby
United States Magistrate Judge
